Good morning, Your Honor, and may it please the Court. My name is Abby Furlong. I'm here today with co-counsel Bridget Pennick, representing appellants across Appalachia's IADU Table Mound and Impact MHC Management. This case presents an issue of first impression in this circuit about the proper bounds of requests for accommodation under the Fair Housing Amendments Act. This Court should find in favor of appellants for three reasons. First, the Court should follow the reasoning and analysis of the Second Circuit in Salute v. Stratford-Greens Garden Apartments that accepting a housing choice voucher is not an accommodation required under the FHAA regardless of its reasonableness. Second, assuming this Court finds Salute's reasoning does not apply here, the requested accommodation was not necessary under the specific facts of this case because Appley failed to establish a causal nexus between her disabilities and her inability to pay her lot rent. Third, Appley's requested accommodation was not reasonable under the specific facts of this case because it required appellants to fundamentally alter its longstanding neutral policy against accepting housing choice vouchers outside of two very limited circumstances and subjected appellants to undue burden. First, the District Court's legal finding that housing choice vouchers must be considered as a reasonable accommodation was incorrect. Salute is the leading case on this issue and remains the only federal appellate case to specifically consider the burdens and voluntary nature of the housing choice voucher program when determining if accepting such a voucher would be a reasonable accommodation. As an initial step in that analysis, the Salute Court determined the FHAA did not require forced participation in the housing choice voucher program as an accommodation, stating it is fundamental that the law address the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps. This is because the FHAA was not intended to elevate the rights of the handicapped poor over the rights of the non-handicapped poor, in the words of the Salute Court. Let me ask you a question, though. On that point, does that kind of bleed into, do necessary and the Salute Court's analysis sort of go together in the sense that you could also make the argument that the argument you're making right now is about whether the accommodation was necessary? I believe it does, Your Honor, and I think the parties had some difficulty separating those out, so the analysis does essentially follow that necessary element. It's not necessary under Salute because it alleviates not a physical disability, but the economic disadvantages that may correlate with the disability itself. However, the court next turned to the burdens inherent in the housing choice voucher program, finding that the voluntariness provision of Section 8 reflects a congressional intent that the burdens of participation are substantial enough that participation should not be forced on landlords, either as an accommodation to a handicap or otherwise. The court in Salute stated, we think it is clear in this case that the burden of participating in the Section 8 program cannot be viewed as imposing only reasonable costs or insubstantial burdens, if only because Congress decided this issue by making participation voluntary. Based on Salute's reasoning, this court can find in as a matter of law, either on the basis that the FHAA does not require accommodation of a disabled individual's financial condition or that the forced acceptance of a housing choice voucher specifically is per se not a reasonable accommodation based on the burdens of the program and its voluntary nature. Now the Second Circuit is not alone. In Hemisphere from the Eleventh Circuit, that case is also instructive here. Seventh Circuit. Seventh Circuit. Apologies, Your Honor. Judge Posner, as I recall. Judge Posner, I think, was the author. You are correct. Contrary to Appley's assertion, its holding was not limited by the particular zoning ordinance at issue. The duty of reasonable accommodation that court found in rules, policies, practices, or services that hurt handicapped people by reason of their handicap rather than hurt them solely by virtue of what they have in common with other people, such as a limited amount of money to spend on housing. Those facts are relevant in that reasoning applies under the circumstances here. The requested accommodation was for an exception to Appellant's longstanding policy of refusing to accept housing choice vouchers except where required by law. It does operate in two jurisdictions with source of income laws, North Dakota and Utah, or where it was grandfathered in current residents of a newly acquired community. Those individuals who were previously permitted to use housing choice vouchers with the prior owner were permitted to continue using those vouchers rather than unhouse those individuals. Let me ask you this, which is on the grandfathered, in this particular case, the folks that are does your client actually renew leases and say, oh, you're grandfathered in, so we're going to continue accepting Section 8 vouchers? Do you understand what I'm asking? I do, and the answer is the latter. They do grandfather those individuals in, not only on their existing leases, but they compassionately do not go on to evict those tenants when those leases run out. Instead, they do continue those on. However, limited participation in the housing choice voucher, especially in two very limited circumstances where we're talking about out of impact management's 185 communities that it manages, there are approximately 20,000 plus residents across those in about two dozen states. Forty of those individuals are using housing choice vouchers. That's about 0.2 percent of the entire population that impact manages. Now, getting back to... Do you think that's a problem, though, that you grandfather folks in and say, well, for these people, we're going to go ahead and renew leases, completely renew leases, instead of saying, okay, your lease is over, we're not going to accept the Section 8 vouchers anymore? I don't think it is a problem because, again, this issue was touched upon in the Second Circuit's Take One, Take All provision. That is found at page 298 of that decision. There, the Second Circuit noted that a literal application of Take One, Take All was leading to perverse results. It was leading landlords to simply opt out entirely of the housing choice voucher system because they were afraid if they opted in on a limited basis, for example, where a longstanding tenant became disabled, wanted to use the housing choice voucher, or because of issues with low income. In those cases, instead of risking having to participate in the program on a much broader basis, what the landlords were doing was simply evicting those people. The Second Circuit noted that it was leading landlords to opt for eviction at the expense of persons Congress is solicitous to protect. Now, that is the exact danger that we're looking at here. If the district court's ruling is affirmed, any landlord, any property management company that desires to maintain its choice, its right under the statute not to opt in to the voluntary housing choice voucher program will have no choice but to refuse housing choice vouchers in every circumstance. One more question on the necessary point. I'll tell you exactly what's bothering me on that, much more than on the reasonableness point, which is the following. What if a plaintiff proves that the disability is what caused the lack of income? So there's a direct causal link. Not a direct causal link between the disability and needing Section 8 vouchers, but there is a link between those two. Isn't it necessary at that point, under the plain meaning of the word necessary? Well, I think following Salute's reasoning, it is not, because it's limited to actual physical handicaps and disabilities. But even if we apply the Giebler framework, which did find that lack of income could be related enough to a disability to require accommodation, the facts of this case still preclude that result, because the appellee here did not establish throughout the two-day bench trial that there was a causal nexus between her disabilities and her inability to pay her lot rent. And in fact, looking at the appellee's primary brief, she cites only two record citations in support of her proposition that she established as showing, which is her burden, by the way. On joint appendix page 620 at lines 14 through 18, there was this following exchange. Question. This was direct examination. And you said you've had Social Security for many years. Answer. Yes, after my daughter got hurt. Question. Are you able to work? Answer. No. That is not sufficient to establish the causal nexus. The other record citation was to cross-examination and is even less supportive, because she was testifying about her abilities to work even after becoming disabled in 1993, when she first began to receive disability insurance. Now, among the district court's errors on its factual finding to the necessary element, it impermissibly shifted the burden, which that she cannot work because of her disabilities. The district court went so far as to make its necessity finding with hesitancy and specifically found appellee's evidence was weak, but noted appellant's presented no evidence to the contrary. That is not the, it is not appellant's burden to somehow refute a lack of evidence that the appellee made in response to one of the critical components of her claim. It's axiomatic that defendants could simply rest their case presenting no evidence whatsoever and still prevail if the plaintiff failed to establish each element of the claim. Now, in contrast, the record does contain quite a bit of information about why the causal nexus was not met. First, she had the ability to make her lot rent payments from 2009 until November of 2020. She presented no testimony about her income before going on disability or as to her earnings after going on disability. We have no way of knowing whether appellee would have been capable of affording her rent obligations regardless of her disability. The court even noted this, despite finding that plaintiff did not present evidence of how much money she earned when she was employed prior to her disability. The district court concluded it is theoretically possible that she could not have afforded the current rent even if she was fully employed in her prior profession. Now, that statement alone warrants reversal because it establishes that she did not meet her causal nexus. Appellee also relies heavily on the Shaw case, which is out of the 11th Circuit, which undercuts her arguments in this regard. In Shaw, the individual was disabled, also receiving disability insurance, and that alone was not enough to establish the causal nexus. That case was remanded specifically because it was unclear whether there was a direct causal link between the disability, in that case quadriplegia, and the inability to meet the income requirement to qualify for assistance. What is our standard review on causation? I know you're arguing there's legal error, but assuming there's not legal error, would it be a clear error review? It is clear error, Your Honor. And even under the clearly erroneous standard, which does require some deference to the district court, the findings may be reversed by this court if it is left with the definite and firm conviction that a mistake has been committed, even if there is some evidence in the record to support the district court. With respect to the causal nexus, the Shaw court specifically noted plaintiff's financial state in any particular case could be unrelated, correlated, or causally related to his disability. But in only one of those circumstances does a plaintiff meet the burden of establishing necessity. And we do believe it was clear error for the court to find Appolite met that through reasonableness. That was also clear error in this particular case. Now Appellee relies heavily on- Did the judge ever really make a finding on how much financial burden would be on the landlord? I know there was some testimony, as I understand it, by your client that it would cost $50 to $100 per month, I think it was, or per applicant. What was it again? Yes, it was $50 to $100 per month, or per applicant in terms of the administrative burdens of dealing with two separate checks and some of those. And the judge never really made a finding. He said something to the effect that the client didn't explain how that was calculated. I assume it was an estimate. That's correct. It was an estimate, your honor. And the financial abilities of Appellant- But I don't think the judge ever found it was zero, so- That is correct. What do we have as a finding as to the degree of burden? Well, what we have, your honor, is the district court again, contrary to its ultimate conclusion, found that Appellants had presented evidence of potential significant and substantial burdens. What it concluded was that there was no undue hardship essentially solely because it has participated in the voluntary housing choice voucher program under those two limited circumstances. And again, the court even specifically noted it couldn't ignore its participation in those, albeit in very few instances. And again, it is our position that limited participation, particularly where there is a policy in place- So you're saying on the district court's rationale, the case would come out differently with a landlord who didn't have the grandfather policy? Yes, I believe what the- Because there's no 0.2% exception rate. Correct. But for the Appellant's participation to an extremely limited extent, under the district court's- Now, did you say there's also some state laws that require- Yes, your honor. And so- You couldn't avoid that, could you? That's correct. There's no discretion there. So following the district court's reasoning, any management company or landlord who operates in any one of those source of income states would then be essentially throwing open- How many states have that rule? I don't have the specific number. I believe it's somewhere around 20, possibly a bit more. In this case, Appellants operate in only two of those jurisdictions, Iowa not being one of them. So to accommodate Ms. Klosner in this particular instance, it would be subjecting Appellants to all of the burdens of the Housing Choice Voucher Program in a jurisdiction where they previously have not engaged in that program whatsoever. Are there any grandfathered folks in Iowa, the same state? There are not. And in fact, most of the grandfathered individuals came from a newly acquired community shortly before the first trial began in South Dakota. They were also a little bit distinct from this particular case because for those 20 individuals, they were renting not only the lot itself but also the unit. And so that is a bit distinct from here where Ms. Klosner owns her own unit, renting the lot beneath it. On the standard of review, I'm wondering about whether reasonable should be different. This is an issue, I think, of first impression in this circuit, although other circuits have weighed in. When you're talking about the run of cases and whether something is reasonable, maybe some underlying findings based on the record would make a difference and maybe that's clear air. But I wonder here if we're just not in de novo land because there really weren't a lot of factual findings, in which case the ultimate conclusion about what's objectively reasonable would seem to be a legal question, not a factual question, unlike causation. Am I wrong about that? No, I believe you're exactly right on that. And even when there are mixed questions of this case. Now, another error the district court made was in not really considering the fact that accepting the housing choice voucher would fundamentally alter the policy in place here, which also would fundamentally alter appellant's business operations. What Ms. Klosner was requesting was a housing choice voucher accommodation that would subject a private landlord to entering a third party contract with the government and it would change the very essential obligations of the tenancy itself because there would be a requirement for an additional lease, a HAP contract. This would elevate Ms. Klosner. It would not give her an equal opportunity to use and enjoy her dwelling, but a greater opportunity because she would enjoy more favorable lease terms than her non-disabled comparators who are other residents in the Table Mount community. With that, Your Honor, I would like to reserve my last two minutes for rebuttal unless there are other questions. You may. Go ahead. The only other question I was going to ask is, is there something different, you mentioned this very briefly, the mobile, the trailer parks, the fact that you don't own the unit. Does that make that different than the run of your mill Section 8 housing case involving, say, an apartment where the landlord can come in and make changes to the actual unit itself? It does because in this particular case, appellants are forced to rely on Appley herself in order to maintain the unit. They don't have the ability or the right to come in, make any sort of corrections, make any maintenance improvements. It's completely reliant on a third party who has already demonstrated through testimony that she previously was not able to afford one particular area of maintenance, and so it risks losing the housing choice voucher. It jeopardizes the payment. You may reserve the balance. Thank you. Thank you for your argument. Mr. Schmidt, we'll hear from you. May it please the Court. My name is Todd Schmidt. I represent the appellee in this case, Sue Ellen Klausner, and it's a privilege to be here. This case is about a 63-year-old woman with serious psychiatric conditions who stands to lose her home of 13 years because Impact Communities refuses to accept the voucher that would allow her to pay her rent in full. There was a two-day bench trial in this case, and at the trial, the Court considered two issues. First, whether Ms. Klausner's accommodation request was necessary to afford her an equal opportunity to use and enjoy her home, and second, whether that request was reasonable. And at that trial, Judge Williams heard from eight witnesses, including Ms. Klausner, her mental health practitioner, the director of the Dubuque Housing Authority that administers the voucher program in Dubuque, and two expert witnesses. And the uncontroverted evidence at trial showed that Impact is choosing to operate in two states that require it to accept vouchers, Utah and North Dakota. Now, there was some confusion. At the time that they decided to acquire parks in those states, they determined in their business judgment that it was still worth acquiring those parks, not a fundamental alteration of their housing program. Further, Impact is accepting vouchers in several other jurisdictions where it's not legally required to do so. Impact stated that their policy is to grandfather in current voucher holders when they acquire a new park, and both of the two witnesses that testified for Impact at the trial testified that that policy was necessary because otherwise these tenants would lose their homes, and that it would be, quote, inhumane to have any other policy. Their expert testified that it would be inhumane. But the concern is that the rule of law you're urging will incentivize landlords to adopt an inhumane policy to avoid the burdens of widespread FHA lawsuits or accommodations and to avoid doing business possibly in some of these other states if it's a cost-benefit analysis. Thank you, Judge. What do you say about that? I don't think that Judge Williams said that if you accept vouchers in other jurisdictions that that necessarily means that it's a reasonable accommodation. His analysis was more nuanced than that. What he said was if a housing provider is accepting vouchers in other jurisdictions, you would think that they would be able to articulate specific burdens associated with administering those vouchers, but that did not happen at this trial. The burdens that were articulated by IMPACT were described as vague and insignificant in nature by the finder of fact, Judge Williams. Additionally, there was some discussion about what is the financial burden here of the voucher. IMPACT conceded in this case that they did not have a financial burden. There was no financial burden associated with the voucher. When we were engaged in discovery practice, they stated in their resistance to a motion to compel seeking information about their net worth that there was no financial burden, and on that basis, Judge Williams said that they were not required to provide that information because of that concession. Counsel, I wonder whether trailer parks are different. In particular, there's a loss of control for the landlords over the property, and there's the Section 8 requirement that if the unit is not in good working condition, the government will just flat refuse to pay, and a landlord can't control that when the underlying building structure is owned by your client. Yes, thank you, Your Honor. The housing quality standards work differently in this context. The owner of the structure, in this case, Ms. Klausner, is responsible for upkeep of the structure, so that is correct that if she did not keep up the structure, she could lose the voucher. However, if that were to happen, she's in no worse position than she's in right now, where she's not getting any assistance. I think this is an important point that this is really, in many ways, a mutually beneficial relationship for the parties because it's a guaranteed income stream for IMPACT. But I think you're missing the point of what I'm asking, which is if she has a history of at least one occasion not being able to take care of the structure, and so if she just says, I don't have the money, I can't put in smoke alarms, whatever the case may be, then the landlord is the one who bears the brunt of that particular decision without any control over being able to fix it. If she's receiving the $333 from the voucher payment, she will be able to afford those repairs, and there was no allegation after the party's temporary agreement that she wasn't making repairs because with that temporary agreement, she could afford to make the repairs. So she's better positioned to make the repairs with the voucher, and in fact, she has a strong incentive to do so because she'll lose the voucher. So it's more likely that she will be making the necessary repairs and the park will have a guaranteed income stream. And I will point out, too, with respect to burdens, the expert, Mr. Griswold, that testified on behalf of IMPACT wrote a book in 2014 called Landlord's Toolkit for Dummies, where he discusses the voucher program. And he wrote in that book that many landlords find the program to be very easy. You get paid like clockwork. And he also made the point that I just made about there's a strong incentive for tenants to comply with their leases because they will lose this regular voucher payment, which in this case is critically important for Ms. Klostner because she's going to lose her home if she doesn't comply and if she were to violate the program rules. On the necessary point, very quickly, I ask the opposing counselor, she mentioned it. There didn't seem to be evidence, when I asked the question about what if the disability causes the inability to pay. And she mentioned that there didn't appear to be much evidence actually supporting that. And actually, the district court kind of dodged it, basically saying, you know, there's an argument that there's not enough evidence linking the two, but went ahead and excused it anyways. And I just wanted to give you a chance to respond to that because that's an important point, I think. Thank you, Judge Strauss. So this comes up in the Giebler case, the 2003 case that applies the Supreme Court decision in Barnett to an explicitly declined to follow salute. In that case, Mr. Giebler had been working and was able to afford his rent. Then he contracted AIDS. He was not able to afford his rent, he was on disability. So you could sort of see the before and after very clearly. The record does reflect that Ms. Klostner was working as a cosmetologist and able to support her family financially. The difference between this case and Giebler, though, is that this was many years in the past. I mean, she's had a disability. Her family was a victim of a traumatic event in the early... You could still present evidence of what a non-disabled cosmetologist was making then or could make now and support a finding about whether or not that would be enough to account for all of her expenses, including these increased rents. So query whether there's just a failure of proof here. There was testimony that was uncontested that she was supporting her family financially as a cosmetologist. The other thing I will note is... Yeah, but that was, as you say, years ago before the rents were raised, which is what gave rise to this whole problem, as I understand it. The disability arose earlier, but I think that she did establish and Judge Williams found that there was a nexus, that she could afford her rent before she became disabled. After the disability arose, she couldn't afford her rent, and there was a lot of evidence about inability to pay. She has been receiving federal disability benefits for 30 years, and she was clearly in a very bad state at the time of this trial. Her mental health practitioner testified that she was suicidal and terrified that she was going to lose her home and have to go out... I don't understand about the current situation. I was asking about the question whether she could pay if she were not disabled. But let me ask you this, what about the absurd consequences that the Seventh Circuit was concerned about in the Hemisphere case? I wonder whether the district court and your brief are over-reading this Barnett case to supersede Hemisphere and salute, because the holding of Barnett was simply that the fact that there must be preferential treatment for a disabled person in and of itself does not make it unreasonable. That doesn't really go to the broader question of whether accommodations have to go beyond things that would address the physical handicap or the major life activity, and instead accommodate all the downstream economic effects of a disability. So what do you say about Barnett and Hemisphere? Let's talk briefly about Hemisphere first. So Hemisphere was a zoning case, and I think Hemisphere stands for the proposition that a general interest in low-cost housing is not a reasonable accommodation. In that case, you had a developer. There was no specific person with a disability where you could create a nexus. They couldn't meet the necessity standard in that case, because the developer just said, well, low-cost housing will be necessary for people with disabilities. But I don't think... What if you brought in a real... I don't think that was the reasoning of the Seventh Circuit, but let's change the facts then if you want to, and say you bring in a real person who would be disadvantaged by the development. Well, I mean, the context is totally different in a zoning case. I know it's totally different, but I'm trying to get... What is your limiting principle on your argument? Well, I think that in the Hemisphere case, there was no necessity established. That would be the first part of the test, that you would need to show that there's a reasonable accommodation would actually address a disability-related need. Hemisphere was nowhere close to establishing that. I do want to talk about Salute in the last minute here, if I can. Obviously, that's an important case. The case at Barr is really much different than the case that the Second Circuit heard 25 years ago in Salute. First, the case law has really trended away from Salute since that case was decided. In the Barnett case, it was an ADA case, but the Supreme Court laid out the proper analysis of a reasonable accommodation claim and found that you can provide preferences for a plaintiff in order to meet the statute's equal opportunity goal. Additionally, in the reasonableness analysis, there's really a low threshold to establish reasonableness. Once an accommodation is shown to be reasonable on its face, the burden shifts to the defendant to show undue burden, and the court reasoned that a defendant's better positioned to establish undue burden than a plaintiff is to disprove it. After that, there have been a series of cases, Giebler, which we've discussed, and then the Shaw case in the Eleventh Circuit, and this circuit, too, in the Edwards case. It was an unreported decision, but those cases all stand for the proposition that unearned income as an accommodation. What about reducing rent? I would say that's, our position is not that, this case is not about whether Ms. Klostner pays the rent. This case is about how she pays. Let's say she wasn't eligible for a Section 8 voucher, but she was coming up five or ten dollars short. Why wouldn't reducing rent by five dollars be a required accommodation? That strikes at the very heart of the contract. That would not be reasonable. It's a totally different case than what we're looking at here. What if the contract says we don't take Section 8 vouchers? Well, I mean, in a case like this, the landlord conceded there was no financial burden, and I mean... Well, you either get zero burden, zero burden of processing the Section 8 program. I know the judge had some question about where the 50 to 100 came from, but I didn't understand when to find it was zero. They testified about administrative burdens, but they conceded that there was no financial burden here. Is there a difference between a financial burden and an administrative burden? Are you making a distinction there? Or are you saying the administrative burden was zero? Well, it wasn't an issue in this case because they conceded there was no financial burden. I believe my time has expired. I don't want to cut it. Where's this concession of no financial burden if I wanted to look that up? You said it was in a response to a motion of some kind? Yes, it's in the Appendix 272. It's their resistance to a motion to compel. Thank you. Thank you, Your Honor. All right. Mr. Lee, we'll hear from you. May it please the Court, Jason Lee for the United States of America. This Court should affirm the District Court's ruling. There was no clear error in its finding that Klostner's requested accommodation was reasonable, nor that it was necessary to alleviate the effects of her disabilities. Starting first with salute, this Court cannot follow the decision in salute. For one thing, it is directly contrary to binding circuit precedent, specifically this Court's decision in Peebles. Moreover, its logic is flawed in multiple other respects. Defendant's counsel puts a lot of emphasis on the fact that this is a voluntary program, and normally it is. But I think she overstates the extent of that voluntariness. States and municipalities, for example, have the authority under the program to require landlords to participate in the program and accept rental assistance. And indeed, 23 states and over 100 jurisdictions require landlords to do so. And I think that's strongly indicative of the facial reasonableness of this accommodation here. Moreover, I think it's important to recognize that the terms of the HAP contract, and the only obligations for participating in this program, are those set forth in the HAP contract. Actually, your response, I understand the argument, but if we're going to look at what 23 states do, you're saying that this is subject to clear error view, but we're looking at the laws in 23 states. That doesn't sound to me like a finding of fact. And so the more the argument goes on, the more I'm convinced that reasonableness is de novo review. And I want to give you a chance to respond, because the government spent a lot of time arguing the contrary. Yes, so if the court looks at the decision in Barnett, about the last third of that decision, Justice Breyer specifically notes that facial reasonableness is considered in the context of the specific facts of the case. And that would support a case-specific, context-specific analysis subject to clear error review. The question that was remanded was whether or not the employee's expectations, under the seniority system that was in place with the employer, whether or not it was typically enforced, whether or not there was expectations that that would be followed. So facial reasonableness is case-specific. And here what you have is a very sophisticated manager of manufactured housing. They're about the fifth or sixth largest manager of manufactured housing in the country. And they already participate in this program in four states. So what facial reasonableness comes down to is whether or not there was any clear error in finding facially reasonable. The proposition that a manager of manufactured housing, that already participates in the program, should do so where it's necessary to alleviate the effects of the disabilities of one of the tenants. Can we take into account that we're talking about trailer parks where the disabled individual doesn't own the actual structure? Yes, and that actually makes it easier for Ms. Klosner to remain in the program for some of the reasons that was discussed by plaintiff's counsel. But one thing I did want to mention is the testimony in the record from the administrator of the local public housing authority, which noted that there's a grace period. If Ms. Klosner were found to not be complying for some reason with the housing quality standards, there would be a grace period in which she would be allowed to make fixes and come into compliance. And rental assistance would continue during that time. If there's another inspection and progress is being made, then the grace period can be extended. And again, rental assistance would continue during that time. So it's not the fact that rental assistance would cut off. And even if it were at some point, the parties would simply be back in the present situation where Ms. Klosner has to pay the full amount of her rent out of her existing Social Security benefits. So that's not undue hardship. That's the present situation. What if she just can't pay? I don't know if the proper comparator is what the situation is with her. The proper comparator may be what client or what person could replace her in that particular lot. Wouldn't it? I think the undue hardship analysis has to come in these particular circumstances. So it would be the circumstances applied to Ms. Klosner's situation. And here, the only evidence in the record is that when repairs are necessary, she finds a way to make them. That's the only evidence in the record. The one other thing I wanted to mention before my time expires is, I think the practical consequences of here, especially under the clear error review standard that applies, is first, as the District Court noted, any future accommodation would simply be subject to a case-by-case analysis. It would have to be evaluated on the particular facts of the request. Second, this accommodation really applies to a very narrow slice of the population. A person would have to have a qualifying disability, and because of that disability, they would not be able to work. It's simply not the case that a landlord's going to... Why not? Why is that the limiting principle? I thought your argument was if the disability causes economic hardship or economic loss, then that is something that must be accommodated under the statute. But the accommodation... The only accommodation that must be considered is the one that's actually been requested. And here, because of the finding, there's a direct causal nexus that's been identified. That's found at Addendum 17. I think the District Court was very clear about how we found causation, that when the effects of that disability renders a person financially vulnerable on the precipice of not being able to pay their rent, in that circumstance, it could be necessary to accept rental assistance. Why would it be limited to accepting vouchers? What about reducing rent? Reducing rent would be a fundamental alteration of the program. Why? All you do is... It's easier than going through a whole Section 8 process to just take a $5 reduction in the rent check. Under the HAP contract, the amount of rent that's being charged is fully within the discretion of the landlord. So that would not be permitted under the HAP contract. You mean any change to the HAP contract would be a fundamental alteration? Is that what you're saying? No, it's two separate... First, it would constitute a fundamental alteration that would not be required under the Fair Housing Act. But even if somehow it were, it would not be permitted under this program. Under the program? But I'm talking about your theory of the statute. But go ahead. I guess your time has expired. Although, how is the time divided here? There was 12 minutes for the first lawyer, and then 6 for the second lawyer. Who gets the other two? The first lawyer went over 2 minutes. Oh, you took his... Well, we'll give you another minute then. I didn't realize my questions to Mr. Schmidt ate into your time. So put one more minute on the clock there. The one thing that I will mention is there is a specific textual basis in the Fair Housing Act that would support the District Court's conclusion here. Under the Fair Housing Act, a person can have a qualifying disability if there's a substantial major life activity that would be interfered with. That includes an inability to work. So under the Fair Housing Act, you can have a qualifying disability if the disability prevents you from working. It would be anomalous to read the Fair Housing Act to say, you can have a qualifying disability because you cannot work, but we're not going to require a landlord to accommodate the effects of that inability to work. So I think that's a key basis under the statute for the District Court's decision here. And lastly, I just wanted, on the issue of whether or not there's any evidence that Ms. Klossner's disabilities prevent her from working, I would just direct the Court to the fact that she received Social Security disability insurance payments. The standard for receiving those payments is an inability to engage in substantial gainful work. That's found at 42 U.S.C. 423 D2A. So the mere receipt of those benefits certainly supports the District Court's finding that she's unable to work as a result of her disabilities. And certainly there's nothing in the record that shows that that finding is clear error. So we would respectfully request that this Court affirm the District Court's ruling because the District Court did not clearly err in finding this accommodation reasonable and that it was necessary to alleviate the effects of her disability. All right. Thank you for your argument. All right. We'll hear from you in rebuttal. Ms. Frillon. Thank you, Your Honor. And unless the panel has any questions, I would like to make just a couple of points with my brief time remaining. There was no concession at trial that administrative burdens were not a part of this determination or discussion.    were not a part of this determination or discussion. about those administrative burdens, which are echoed by the Court in the Salute case, noting the Housing Choice Voucher Program subjects landlords to financial audits, maintenance requirements, inspection of premises, reporting requirements, increased risk of litigation. That also leads us to another compelling point here. There is no way to limit this case only to the Ms. Glossner. The very nature of disability discrimination laws requires landlords then, if the accommodation is offered for one, it must be offered for every other individual in similar circumstances, claiming a disability has caused them not to be able to afford their rent payment. There was testimony from Eppley's own witness, Brett Shaw, a Dubuque City Council member, that he personally met with hundreds of residents of Table Mound. He testified that many of whom were disabled or caring for a disabled individual. There's nothing in the record to I see that my time is up. Very well. Thank you for your argument. Thank you to all counsel. The case is submitted. The Court will file a decision in due course.